UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
AT COVINGTON

CIVIL ACTION NO. 14-51-DLB-CJS

FLOYD SMITH, SR.,
*next of friend of Floyd Smith, Jr.*,                                    PLAINTIFF

vs.                              MEMORANDUM OPINION AND ORDER

GREG BUCKLER, et al.,                                                   DEFENDANTS

********************

## I.    Introduction

This matter is before the Court upon Plaintiff Floyd Smith's[1] Motion for Partial

Summary Judgment (Doc. # 46) and Defendants' Motion for Summary Judgment (Doc. #

49).  The parties having file their Responses and Replies, this matter is ripe for review.

## II.   Factual and Procedural Background

Floyd Smith, Jr. is an intellectually disabled young man.  His mental deficits were

observed early in his life.  In 1997, when Smith was six years old, he took an intelligence

test and received scores considered to be in the "moderately deficit range on an

intelligence scale."  Although they seem to disagree about the severity of Smith's disability,

Plaintiff's and Defendants' experts agree that Smith is mentally retarded.  Smith also

contracted the H1N1 virus in October of 2009.  As a result, he was hospitalized for several

weeks and received a tracheostomy tube that remained in his throat throughout his periods

---

1) This suit is brought by Floyd's father, Floyd Smith, Sr., as Floyd's next of friend.

of incarceration in the Campbell County Detention Center.

In 2012, Smith was arrested and booked into the Campbell County Detention Center ("CCDC") four times: on January 20th (released on January 23rd), on March 15th (released the next day), on April 27th (released a few hours later), and on October 28th (released on April 3rd, 2013).  Each arrest was for theft or for failure to appear for in court.

On March 21, 2014, Smith filed suit in this court, seeking damages pursuant to 42 U.S.C. § 1983.  Smith's complaint, although containing only one count, actually brings three claims.  One against Campbell County for failure to adequately train its employees to identify and segregate inmates with intellectual disabilities.  Smith has also sued several Defendants  in their individual capacities for failing to protect his health and safety, and has sued former Jailer Greg Buckler and current Jailer James Daley in their individual capacities for failure to train their employees.

Although Defendants claims to have been unaware of Smith's mental handicaps, there were several facts and instances that could have alerted officials at CCDC to Smith's intellectual disability.  While he did not explicitly inform CCDC that he was mentally retarded, Smith indicated on his booking forms that he could not read or write well and that he had the "mental capacity of a child."  Further, on a triage report completed after Smith demonstrated suicidal ideation, a mental health professional noted that Smith showed signs of mental retardation.  Smith's mother, Connie Smith, alleges that she called the jail on several occasions and informed officials that her son was mentally handicapped and needed to be protected.  Finally, Smith's history of difficulties with other inmates could have indicated to CCDC officials that he was suffering from a mental deficit.

Despite these signs of mental retardation, Smith was not separated from other prisoners during his time at CCDC. This led to a host of problems. Smith was doused in cleaning agents by other inmates who were frustrated by his body odor. Inmates stole his food. Some hit him. He was threatened; one inmate told Smith that he was going to push his tracheostomy tube into his throat while he slept. One day, Smith defecated in the shower. Another inmate found Smith's feces in the shower, and a ruckus ensued. Smith, embarrassed, proceeded to pick up his feces with his bare hands and dispose of it in a bathroom trash can. This further infuriated the other inmates, and led to Smith being moved to a cell with two sex offenders. Smith's trouble continued.

Eventually, officials at CCDC decided to move Smith into an "isolation" cell for his protection. However, despite its title, this cell contained another inmate – Garrett Stewart. Stewart was serving time at CCDC because he had sexually assaulted a mentally retarded man. Stewart is mentally retarded as well. It is unclear from the evidence exactly why these two seemingly incompatible inmates were housed in a small isolation cell together from March 17, 2013 until March 28, 2013.[2] Some officers indicated that it may have been because they thought the two men, both being intellectually disabled, would look out for one another. Regardless of the motivation, during the two inmates' confinement together, Smith was allegedly raped by Stewart. Smith claims he is incapable of consent due to his mental retardation; Defendants assert that, though mentally challenged, Smith is not so deficient as to be incapable of consent, and thus was not raped. Fortunately, the adjudication of these motions does not require the Court to determine the difficult, if not

2) Isolation cells at CCDC are seven feet, three inches wide by twelve feet long. When two inmates are housed together in an isolation cell, one inmate sleeps in the bed and the other is given a kind of cot.

impossible, issue of whether Smith was raped.

The sexual nature of Smith and Stewart's relationship was discovered on March 28, 2013. An officer noticed the two men engaging in what appeared to be sexual activity and alerted other officers to respond. CCDC officers went to Cell P22 and removed Smith. A review of the tape shows Stewart rubbing Smith's genital area while pressing up against his buttocks. At one point, Stewart exposes his penis to Smith, who smacks it away. At no point during this footage did the two men engage in sexual intercourse. Prior footage of their housing together and other alleged incidents was destroyed, but Defendant Fickenscher claims that it revealed no other sexual activity between Smith and Stewart.[3] However, in subsequent interviews with the two men, each disclosed that the two had anal intercourse on at least one prior occasion.

After the interviews were completed, the case was turned over to the Campbell County Attorney. The grand jury declined to indict Stewart for any sex crime stemming from the event. Not long after the disclosure of Smith and Stewart's sexual encounters, Smith was released from CCDC. In the interim, he was placed on suicide watch before due to his struggle to cope with the aforementioned events. He continues to have emotional difficulties, and those close to him say he has become withdrawn. Smith now seeks civil recourse for his alleged injuries.

Under Kentucky law, jails have a special obligation to protect mentally retarded inmates. Specifically, every jail is required to have a prisoner-classification system that provides for the separation of mentally ill or mentally retarded prisoners from other

---

3) Plaintiff has filed a Motion for Sanctions (Doc. # 69) alleging spoilation of evidence by Defendants for destroying the recordings of Smith and Stewart's cell.

prisoners.  501 Ky. Admin. Regs. 3:110(2)©.

Plaintiff has filed a Motion for Partial Summary Judgment, asking the Court to find that: (1) Campbell County acted with deliberate indifference to the health and safety of intellectually disabled persons; and (2) this deliberate indifference caused damage to Smith.  Defendants have also filed a Motion for Summary Judgment, asking that the case be dismissed in its entirety against all Defendants.

## III.    Analysis

### A.    Standard of Review

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In deciding a motion for summary judgment, the Court must view the evidence and draw all reasonable inferences in favor of the non-moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The "moving party bears the burden of showing the absence of any genuine issues of material fact."  *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 483 (6th Cir. 2008).

Once the movant has satisfied its burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co.*, 475 U.S. at 586; rather, it must produce specific facts showing that a genuine issue remains.  *Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 934 (6th Cir. 2000).  If, after reviewing the record in its entirety, a rational fact finder could not find for the nonmoving party, summary judgment should be granted.  *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 349 (6th Cir. 1998).

Importantly, the standard of review does not change merely because the parties present cross-motions. *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991). Such motions require the Court to "evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the non-moving party." *Beck v. City of Cleveland, Ohio*, 390 F.3d 912, 917 (6th Cir. 2004) (quoting *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 2004)).

**B.  Claims against Campbell County**

Smith has sued former Campbell County Jailer Greg Buckler and current Campbell County Jailer James Daley in their official capacities. These official capacity claims are construed as claims against Campbell County itself. *See Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985); *Baar v. Jefferson Cnty. Bd. of Educ.*, 476 F. App'x. 621, 635 (6th Cir. 2012). Smith claims that Campbell County violated his constitutional rights by being deliberately indifferent to his needs while incarcerated. Specifically, Smith alleges that Campbell County should be liable because it failed to properly train its officers on how to identify, classify, and safely segregate mentally retarded inmates.

As a threshold matter, the Court notes that Campbell County is properly sued in this action, and is not protected by sovereign immunity. The action or conduct of a Kentucky county's detention center is conduct of the county. *Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994); *see also Johnson v. Hardin Cnty.*, 908 F.2d 1280, 1285-86 (6th Cir. 1990) (holding that a suit against the county police department is properly construed as one against the county); *Parker v. Laurel Cnty. Detention Ctr.*, No. Civ.A. 605-113-DCR, 2005 WL1917149 (E.D. Ky. Aug. 9, 2005) (noting that the county is the proper party to be sued where the claim is against the county jail). Although sovereign immunity protects states

6

and their instrumentalities from suit, it does not bar § 1983 actions against counties and municipalities. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977). Accordingly, while Kentucky counties are "cloaked with sovereign immunity" from state-law claims, *Lexington-Fayette Urban Cnty. Gov't v. Smolcic*, 142 S.W.3d 128, 132 (Ky. 2004), they are exposed to liability under federal law. *Doyle*, 429 U.S. at 280.

However, for a county to be liable under § 1983, the plaintiff's injury must be attributable to a municipal policy or custom. *Board of Cnty. Comm'rs of Bryan Cnty. Okla. v. Brown,* 520 U.S. 397, 403 (1997) (citing *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978)). For liability to attach, the policy or custom must be made by either the municipality's lawmakers or "by those whose edicts may fairly be said to represent official policy." *Monell*, 436 U.S. at 694. Municipal liability may be found where the local governing body has delegated policy-making authority to the jailer or where the jailer has final authority with regard to a county policy. *Id.* Thus, it can fairly be said that the actions of Buckler and Daley were actions of CCDC, which in turn were actions of Campbell County.

Smith alleges a failure-to-train claim against Campbell County, arguing that the CCDC failed to adequately train its employees in the classification and segregation of intellectually disabled inmates. In order to state a claim for a failure to train, a plaintiff must demonstrate "that a training program is inadequate to the tasks that the officers must perform; that the inadequacy is the result of the [municipality's] deliberate indifference; and that the inadequacy is 'closely related to' or 'actually caused' the plaintiff's injury." *Hill v. McIntyre*, 884 F.2d 271, 275 (6th Cir. 1989); *see also Carey v. Helton*, 70 F. App'x. 291, 294 (6th Cir. 2003). The need for more or different training must be so obvious, and the

7

inadequacy so likely to result in the violation of constitutional rights, that "the policy makers of the [governmental body] can reasonably be said to have been deliberately indifferent to the need."[4]   *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989).   Deliberate indifference is a stringent standard of fault, *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 410 (1997), and "[a] plaintiff ordinarily cannot show that a municipality acted with deliberate indifference without showing that the municipality was aware of prior unconstitutional actions of its employees and failed to respond."   *Stemler v. City of Florence*, 126 F.3d 856, 865 (6th Cir. 1997); *see also Fisher v. Harden*, 398 F.3d 837, 849 (6th Cir. 2005) (holding that a plaintiff "must show prior instances of unconstitutional conduct demonstrating that the municipality has ignored a history of abuse and was clearly on notice that the training in this particular field was deficient and likely to cause injury").

There are two ways that Smith can prove Campbell County was deliberately indifferent by failing to train its corrections officers in how to identify potential mental retardation.  First, and most common, is by showing a pattern of similar unconstitutional violations of which Campbell County or its Jailers were aware.  *Brown*, 520 U.S. at 407-08; *see also Essex v. Cnty. of Livingston*, 518 F. App'x 351 (6th Cir. 2013).  Smith has produced no evidence that mentally retarded prisoners were routinely abused by other inmates or even that they were routinely housed with other inmates. Accordingly, Smith cannot prove his failure-to-train claim based on a deliberate indifference to a pattern of constitutional violations.

---

4) The Court should note that during the course of this Memorandum Opinion and Order, three separate "deliberate indifference" tests will be used to analyze Smith's claims.

The second method for proving a failure-to-train claim is by demonstrating that the constitutional violation alleged is a "patently obvious and 'highly predictable consequence" of inadequate training. *Essex*, 518 F. App'x. at 356 (quoting *Brown*, 520 U.S. at 409). In *Brown*, the Supreme Court noted that, "in a narrow range of circumstances, a violation of federal rights may be a highly predictable consequence of failing to equip law enforcement officers with specific tools to handle recurring situations." *Brown*, 520 U.S. at 409. The likelihood that the situation will recur and the predictability that the failure to train will result in a violation of a citizen's rights may justify a finding that the policymakers' decision not to train the officials reflects a "deliberate indifference to the obvious consequence of the policymakers' choice – namely, a violation of a specific constitutional or statutory right." *Id.*

Here, it is both likely that CCDC would encounter mentally retarded inmates and that the failure to identify and segregate those mentally challenged inmates could result in their being harmed by other inmates. Defendants have produced voluminous evidence of the training allegedly received by the correctional officers at CCDC. However, the deposition testimony of the officers at CCDC revealed that many did not remember receiving training on how to identify inmates potentially suffering from mental retardation. Specifically, five out six of the officers deposed, including two of the three classification officers, were unaware that mentally retarded inmates must be segregated from others.[5] (Docs. # 46-25 at 14; 46-19 at 11; 46-41 at 72; 46-30 at 19; 46-29 at 16; 57 at 6).

Generally speaking, testimony that a particular officer does not recall receiving training is, standing alone, insufficient to defeat summary judgment. *Russo v. City of*

---

5) This number does not include either Jailer. Each testified that he was aware of the segregation requirement.

*Cincinnati*, 953 F.2d 1036, 1049 (6th Cir. 1992) (Wellford, J., concurring); *see also Sova v. City of Mt. Pleasant*, 142 F.3d 898, 904 (6th. Cir. 1998) (upholding a grant of summary judgment where the record showed extensive training, and noting that "[a]llegations that a particular officer was improperly trained are insufficient to show liability"); *Carey*, 70 F. App'x at 294.  Here, however, Smith has presented evidence from more than one or two officers who do not recall receiving training on the classification and segregation of mentally retarded prisoners.  Given nearly all CCDC officials testified that they did not recall being trained on the identification of inmates with intellectual disabilities, and construing all inferences and facts in Smith's favor, whether the employees of CCDC actually received training on the identification of potentially mentally retarded inmates and whether they were trained to segregate them from the general population is a genuine issue of material fact best resolved by a jury.   Accordingly, the Court must deny Defendants' Motion for Summary Judgment as to Campbell County.

But the genuine issues of material fact created by Smith cut both ways.  Thus, the Court cannot grant Smith's Motion for Partial Summary Judgment because of the same fact issues mentioned above.

### C.   Claims against Individual Defendants

Smith also has sued multiple Defendants in their individual capacities.  These claims can be broken down into two types: individual capacity failure-to-train claims against Buckler and Daley, and Eighth Amendment claims alleging deliberate indifference to Smith's health and safety against Buckler, Daley, Patricia Dietz, Bernard Henke, Henry Webber, Joseph Alexander, Jared Dornhaggen, David Fickenscher, Gracy Nagel, Larry Sandusky, Corey Whitaker, J. Gilbert, Bradford Young, Desiree Hammond, and Bruce

Markus.[6]  Each will be addressed in turn.

### 1.    Qualified Immunity

Government officials sued in their individual capacities are shielded by qualified immunity.  Qualified immunity may be overcome, however, if a plaintiff can show that a constitutional right was clearly established at the time of the alleged misconduct and that the officer's conduct amounts to a constitutional violation.  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The two prongs may be addressed in either order.  *Id.* at 236.  Here, both individual-capacity failure-to-train claims and Eighth Amendment inmate safety claims are well-established members of the canon of § 1983 case law. *Phillips v. Roane Cnty.*, 534 F.3d 531, 543 (6th Cir. 2008) (highlighting the standard for individual-capacity failure-to-train claims); *Farmer v. Brennan*, 511 U.S. 825 (establishing an Eighth Amendment claim for prisoners denied adequate protection from health and safety risks).  Thus, the Court finds that Smith's right to be free from the harm caused by inadequately trained officials and to have prison officials adequately safeguard his health and safety was clearly established at the time of his injury.  Thus, the following sections only address whether Smith has demonstrated a genuine issue of material fact with regard to the existence of a constitutional violation by any of the defendants.

### 2.    Individual-Capacity Failure-to-Train Claims

Failure-to-train claims come in two varieties: official and individual capacity.  Above, the Court addressed the official-capacity claims.  The standard for individual-capacity

---

6) The Eighth Amendment is the constitutional hook for failure to protect claims for inmates serving their term of imprisonment.  The Fourteenth Amendment, rather than the Eighth, protects the rights of pre-trial detainees. It is unclear from the record whether Smith was a pre-trial detainee or was serving a term of imprisonment. However, because the failure to protect analysis is the same under either standard, this distinction does not impact the outcome of this Order.

failure-to-train claims differs from that of official capacity. *See Essex*, 518 F. App'x at 355. In individual-capacity failure-to-train claims, the defendant must be found to have "encouraged the specific incident or misconduct or in some other way directly participated in it." *Phillips*, 534 F.3d at 543 (quoting *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999); *see also Essex*, 518 F. App'x at 355. Therefore, Smith must demonstrate that Buckler or Daley "at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Phillips*, 534 F.3d at 543.

A key element is that the supervisor "directly participated" in, or "actively acquiesced" to, the misconduct. *See Gregory v. City of Louisville*, 444 F.3d 725, 752 (6th Cir. 2006); *see also Taylor v. Michigan Dep't of Corrs.*, 69 F.3d 76, 80 (6th Cir. 1995) (finding potential liability where supervisor approved inmate transfers despite knowing that the inmate files were not reviewed prior to the transfers, which lead to plaintiff's injury); *Hill v. Marshall*, 962 F.2d 1209, 1213 (6th Cir. 1992) (finding potential liability where defendant supervisor personally referred inmate complaints to nursing staff that he knew was wrongly altering and destroying inmate prescriptions). Thus, liability must "lie upon more than a mere right to control employees and cannot rely on simple negligence;" instead, there must be "some conduct on the supervisor's part to which a plaintiff can point that is directly correlated with the plaintiff's injury." *Gregory*, 444 F.3d at 751-52.

Here, Smith has produced no evidence during discovery that either Buckler or Daley were directly involved with the decision to house him in the general population or with Garrett Stewart. Both men testified that they did not know Smith or Stewart or that their officers planned to house the two men together. Unlike the defendants in *Hill* and *Taylor*, who each knew of dangers created by their employees but chose to acquiesce to their

12

actions anyway, Smith has not shown that Buckler or Daley ever knew that the screening for intellectually disabled inmates was inadequate or that mentally retarded inmates were being housed with the general population or with inmates who were potentially dangerous. Buckler testified that he knew that mentally ill and intellectually disabled inmates were supposed to be segregated from other inmates. (Doc. # 46-28 at 108-09). But he did not know that Smith was mentally retarded or being housed with other inmates. (Doc. # 46-28 at 117-18). Daley, whose tenure at CCDC began in February 2013, likewise was unaware of the housing of Smith with other inmates. Daley did not become aware of Smith or his disability until he was advised of the sexual incident between Stewart and Smith that occurred on March 28, 2013.

Thus, Smith cannot produce any evidence that Buckler or Daley encouraged or acquiesced to his housing with other inmates. The mere right to control employees is not enough to find a supervisor liable for an individual-capacity failure-to-train claim, and even if Buckler and Daley were negligent in training their employees on identifying mental retardation, that negligence is not enough for individual liability to attach in these cases. *Gregory*, 444 F.3d at 751-52. Because Smith cannot prove that either Defendant encouraged or acquiesced to the housing of Smith with Stewart and other inmates, the individual-capacity failure-to-train claims against Buckler and Daley must be **dismissed**.

### 3.    Individual-Capacity Failure-to-Protect Claims

Smith has sued Buckler, Daley, Dietz, Henke, Webber, Alexander, Dornhaggen, Fickenscher, Nagel, Sandusky, Whitaker, J. Gilbert, Young, Hammond, and Markus in their individual capacities for failing to protect him from other inmates. For failure-to-protect claims, Smith needs to prove two elements. *See Miller v. Calhoun Cnty.*, 408 F.3d 803, 812

13

(6th Cir. 2005) (noting that the Supreme Court has adopted a mixed objective and subjective standard for Eighth Amendment deliberate indifference claims); *see also Mingus v. Butler*, 591 F.3d 474, 479-80 (6th Cir. 2010) (noting the objective and subjective prongs of Eighth Amendment inmate protection claims). First, that the risk to his health and safety was objectively obvious and sufficiently serious. *Id.*; (citing *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008)); *see also Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 897 (6th Cir. 2004) (holding that the objective component is analyzed under an "obviousness" approach). Here, it was. The Sixth Circuit has held that a substantial risk to inmate safety may occur where a prison official is aware that an inmate is vulnerable to assault and fails to protect him. *See Greene v. Bowles*, 361 F.3d 290, 294 (6th Cir. 2004) (noting that plaintiff could defeat defendant's motion for summary judgment by "point[ing] to evidence from which a finder of fact could conclude that her vulnerability made her placement in [a unit] with high security inmates a substantial risk to her safety); *see also Bishop v. Hackel*, 636 F.3d 757, 767 (6th Cir. 2011). Housing intellectually disabled inmates with the general population exposes a vulnerable group of inmates to risk of harm. Housing a mentally retarded male inmate with an inmate in prison for sexually assaulting a mentally disabled man certainly qualifies as a substantial risk of serious harm as well.

Second, Smith must prove that the Defendants were "deliberately indifferent" to that risk. Deliberate indifference is something more than negligence, but something less than "acts or omissions for the very purpose of causing harm or with full knowledge that harm will result." *Farmer*, 511 U.S. at 835. "*Farmer* makes clear that the correct inquiry is whether [an official] had knowledge about the substantial risk of serious harm to a particular class of persons, not whether he knew who the particular victim turned out to be." *Taylor*,

14

69 F.3d at 81. This standard is not about what prison officials should have known or should have done. *Ruiz-Bueno v. Scott*, Nos. 14-4149, 14-4151, 2016 WL 385294, at *7 (6th Cir. Feb. 2, 2016). Instead, the second element is a subjective standard, and whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence. *Farmer*, 511 U.S. at 842.   The defendant must not only be subjectively aware of the facts from which an inference could be drawn that a substantial risk of serious harm exists, but they must also draw that inference and disregard the risk. *Phillips*, 534 F.3d at 539-40; *Sours v. Big Sandy Reg'l Jail Auth.*, 593 F. App'x 478, 484 (6th Cir. 2014) (quoting *Farmer*, 511 U.S. at 837).

Prison officials may escape liability by showing that they were unaware  even of an obvious risk to inmate health or safety.   *Farmer*, 511 U.S. at 843.   A factfinder may conclude, however, that a prison official knew of a substantial risk from the very fact that the risk was obvious.   *Id.* at 842-43.   And prison officials who knew of a substantial risk may be found free from liability if they can show that they "responded reasonably to the risk, even if the harm ultimately was not averted."   *Id.* at 844.

The subjective component of a deliberate-indifference claim must be addressed for each officer individually. *Phillips*, 534 F.3d at 541-42. When the Court, as here, is faced with multiple defendants asserting qualified-immunity defenses, the Court must consider whether each individual defendant had a sufficiently culpable state of mind.  *Id.*; *see also Garretson v. City of Madison Heights,* 407 F.3d 789, 797 (6th Cir. 2005) (holding that the subjective component of a deliberate indifference claim must be addressed for each officer individually).  Accordingly, the Court will address each Defendant in turn.

15

### i.      Greg Buckler

Smith has not produced evidence that Defendant Buckler was aware of a substantial risk of serious harm.  Buckler's testimony indicates that he did not know who Smith was or anything about him.   While Buckler knew that mentally retarded inmates needed to be segregated from the general population, he did not disregard that risk here.  He did not personally house mentally retarded inmates, such as Smith, with other inmates, and was not involved in the classification of housing decisions related to Smith's incarceration. Moreover, the majority of the harmful events occurred after Buckler had ceased being Campbell County Jailer.  Accordingly, the failure-to protect claims against Buckler must be dismissed.[7]

### ii.      James A. Daley

Similarly, Smith has not demonstrated that Daley disregarded a substantial risk of serious harm.  Like Buckler, Daley was the Campbell County Jailer.  He knew that mentally retarded inmates needed to be segregated for their protection, but he did not disregard that risk as it related to Smith.   The record shows that Daley was unaware of who Smith was until after the March 28, 2013 incident, and that he did not know that Smith was mentally retarded and being housed with other inmates.  Accordingly, the failure-to-protect claims against Daley must be dismissed as well.[8]

### iii.      Patricia Dietz (neé Gilbert)[9]

---

8) All individual capacity claims against Defendant Buckler have now been dismissed.

9) All individual capacity claims against Daley have now been dismissed.

10) Patricia Gilbert's name changed to Dietz when she was married, and is referred to by both surnames throughout the record.  For clarity, she is referred to as Patricia Dietz in this Memorandum Opinion and Order.

Patricia Dietz had several interactions with Smith, and came away thinking Smith was "a little slow." (Doc. # 46-19 at 15). And in December 2012, when Smith was triaged by a mental health professional after displaying suicidal ideation, Dietz signed off on a form completed by that mental health professional. On that form, the mental health professional indicated that there was evidence of mental retardation. The form was signed as "Received and Reviewed" by Dietz. (Doc. # 46-18). From this, a jury could reasonably conclude that Dietz knew Smith was mentally retarded. Dietz has presented no evidence that she took any steps to report Smith's mental retardation to anyone at CCDC or that she did not understand that mentally retarded and mentally ill inmates are at an increased risk of assault. It is possible that, despite the obviousness of the risk, that Dietz was unaware of the danger Smith faced. The obviousness of the risk, however, also may be circumstantial evidence of her deliberate indifference to Smith's well-being. *See Farmer*, 511 U.S. at 842-43. Whether she drew an inference of risk from the facts she knew and still disregarded it is a question of fact for the jury. Therefore, Defendants' Motion for Summary Judgment is **denied** as to Dietz.

### iv.   Bernard Henke

Henke is a classification officer at CCDC, and in that position, he is responsible for classifying inmates and making decisions about where to house them within CCDC. Henke had multiple interactions with Smith. During these interactions, it can be reasonably inferred that Henke would have learned that Smith "had trouble reading and writing" and had "the mental capacity of a child." (Doc. # 46-14). It could also be inferred that Henke approved housing Smith with Stewart. Inmate records are generally reviewed prior to housing decisions, and the type of offense figures into the classification decision. Since

Stewart was in CCDC for a sex offense, he was given a medium-risk classification. Additionally, a cursory review of Stewart's file would have revealed that he was in CCDC for sexually assaulting a mentally retarded man. While obviousness of the risk alone is not enough for liability, a jury can infer subjective awareness of a risk form the very fact that the risk is obvious. *See Farmer*, 511 U.S. at 842-43.  Given these facts, a reasonable jury could infer that Henke was aware that Smith was mentally retarded, that this put him at increased risk, and that he disregarded this risk by allowing Smith to be housed in the general population and with Stewart.   Accordingly, Defendants' Motion for Summary Judgment is **denied** as to Henke.

### v.    Henry Webber

There also is a genuine dispute of material fact regarding whether Henry Webber was deliberately indifferent to Smith's health and safety.  The record indicates that Webber made the decision to house Smith and Stewart together.  (Doc. # 46-17 at 20).  Smith's mother, Connie Smith, also alleges that she spoke with Webber on the phone, and informed him that Smith was being harassed by two other sex-offender inmates with whom he was housed – Chris Raleigh and Eugene Bennett. (Doc. #46-21 at 34); (Doc. # 46-17 at 20) (March 17, 2013 incident report in which Webber acknowledges talking to Smith's mother). These two men allegedly were abusing Smith, and Connie informed Webber that Smith was "mentally handicapped."  (Doc. # 46-21 at 34).  This information is what led Webber to place Smith in an isolation cell with Stewart.  Webber could not recall why he made this decision and claimed that he did not know that Stewart was in CCDC for sexually assaulting a mentally disabled man.  Based on the evidence presented by Smith, a jury could conclude that Webber knew Smith was intellectually disabled, that this placed him

18

at increased risk – especially if housed with someone like Stewart – and chose to house them together anyway. While Webber may ultimately be able to prove that he, in fact, did not know about Stewart's offense, a jury could also infer knowledge from the obviousness of the risk. *See Farmer*, 511 U.S. at 842-43. Accordingly, Webber is not entitled to qualified immunity and Defendants' Motion for Summary Judgment is **denied** as it pertains to him.

### vi.    Joseph Alexander

Defendant Alexander was the Main Control Room Operator who observed what he believed to be inappropriate sexual contact between Smith and Stewart. Smith has produced no evidence that Alexander was subjectively aware that he was mentally retarded or that Stewart was in prison for the sexual assault of a mentally retarded man. Moreover, once Alexander observed what was happening in Cell P22, he immediately reported it to the booking desk. A defendant who responds reasonably to a risk, as Alexander did, cannot be held liable for being deliberately indifferent, even if the ultimate harm was not averted. *See Farmer*, 511 U.S. at 844. Once Alexander was aware of the risk to Smith, he took all reasonable steps to prevent the potential harm. Smith has failed to prove that a genuine issue of material fact exists regarding whether Alexander ignored a substantial risk of serious harm, and accordingly, all individual-capacity claims against him must be dismissed.[10]

### vii.    Jared Dornhaggen

Defendants' Motion for Summary Judgment will be **denied** as it relates to Dornhaggen. Under the summary judgment standard, the Court must view all facts and

---

11) The sole individual capacity claim against Alexander has now been dismissed.

19

draw all inferences in Smith's favor.  Smith has presented evidence that Dornhaggen believed Smith was "slower," but that he couldn't determine if he was intellectually disabled. (Doc. # 46-25 at 15).   Dornhaggen, however, did not refer Smith to medical so that someone there could help make that determination.  (Doc. # 46-25 at 15-16).  From this, it can be inferred that Dornhaggen might have believed that Smith was mentally handicapped.  Whether Dornhaggen understood Smith's retardation made him vulnerable to harassment and assault and whether he disregarded that risk by not telling his supervisors about his suspicions are questions of fact best resolved by the jury. Dornhaggen has not produced evidence that he attempted to notify anyone about Smith's disability or that he did not understand the risk which mentally retarded and mentally ill prisoners face.  This is the exact sort of evidence that would support an inference of deliberate indifference.  At this stage, Smith has presented sufficient evidence to create a genuine issue of material fact regarding whether Dornhaggen was deliberately indifferent to Smith's safety.

### viii.   David Fickenscher

Defendants' Motion for Summary Judgment will also be **denied** as to Fickenscher. Fickenscher was the Chief Deputy at CCDC from May 2009 until May 2013.  (Doc. # 46-24 at 12-13).   Fickenscher had extensive interactions with Smith – at least twenty-five interactions according to his testimony – and helped with Smith's intake process.  (Doc. # 46-24 at 19-24).  Fickenscher also talked with Smith's mother about her son.  (Doc. # 46-24 at 21-23).  Fickenscher acknowledged that he knew Smith was slower than average, but like Dornhaggen, never referred Smith for any sort of medical or mental evaluation.  (Doc. # 46-24 at 43-44).  Fickenscher was also aware of the decision to house Smith with Stewart

and did not object or seek to evaluate the two inmates' files to make sure they were compatible. (Doc. # 46-31 at 66-67). Accordingly, Smith has produced sufficient evidence of Fickenscher's deliberate indifference to defeat his motion for summary judgment.

### ix.    Gracy Nagel

Gracy Nagel began working at CCDC in 1997, and eventually attained the rank of Major. Nagel is a classification officer at CCDC, and in that capacity, she may have approved the housing of Smith and Stewart together. Nagel testified that Henke advised her of the decision to place Smith and Stewart in the same isolation cell. (Doc. # 46-41 at 69-70). Further, Daley testified that Nagel approved this decision because both Smith and Stewart were "below average functioning." (Doc. # 46-31 at 66-68).

From these facts, a reasonable juror could infer that Nagel was aware of Smith's mental limitations, was aware of the risk he faced, and deliberately disregarded that risk by approving the placement of Smith in an isolation cell with Stewart. While Nagel ultimately may be able to prove that she did not know about Stewart's sex offenses or Smith's intellectual disability, the potential obviousness of both facts could also be used to infer deliberate indifference. Such tough questions are best resolved by the jury. For these reasons, Defendant's Motion for Summary Judgment is **denied** as it pertains to Nagel.

### x.    Larry Sandusky

There is no genuine issue of material fact whether Sandusky was deliberately indifferent to Smith's health and safety. The record shows that Sandusky had extremely limited interaction with Smith, escorting him from one part of the jail to another after Smith had conflicts with inmates. On another occasion, Sandusky was a witness to Smith being escorted after Smith again had conflict with inmates. The record does not indicate that

Sandusky had an influence in classifying or housing Smith, or that he had any clue that Smith was intellectually disabled.  In fact, the record is so limited as to Sandusky that Smith did not respond to Defendant's Motion for Summary Judgment as it pertains to Sandusky.  Accordingly, all claims against Sandusky are hereby dismissed.[11]

>           **xi.    Corey Whitaker, J. Gilbert, Bradford Young, Desiree Hammond, and Bruce Markus**

Neither party addressed Corey Whitaker, J. Gilbert, Bradford Young, Bruce Markus, or Desiree Hammond in their Motions and Responses.  After reviewing the record, the Court has not been able to find any evidence that would suggest that these Defendants were deliberately indifferent to Smith's rights.  In accordance with Federal Rule of Civil Procedure 56(f)(3), the Court will order that Plaintiff respond to the argument that these Defendants should be dismissed for want of a genuine issue of material fact.  Defendants will be given an opportunity to respond to Smith's argument, if any.

## IV.   Conclusion

For the reasons stated herein, **IT IS ORDERED** as follows:

(1)    Plaintiff's Motion for Partial Summary Judgment (Doc. # 46) is **denied**;

(2)    Defendants' Motion for Summary Judgment (Doc. # 49) is **granted** in part, **denied** in part.

(a)    Specifically, Defendants' Motion is **granted** as it pertains to Defendants **Greg Buckler, James Daley, Joseph Alexander, and Larry Sandusky**;

(b)    Defendants' Motion is **denied** as it pertains to Defendants **Campbell County, Patricia Dietz, Bernard Henke, Henry Webber, Jared Dornhaggen, David**

---

12) All claims against Larry Sandusky have now been dismissed.

**Fickenscher, and Gracy Nagel**;

(3)     Plaintiff shall file a Response within **fourteen (14) days** of the entry of this Order to the Court's inquiry regarding whether a genuine issue of material fact exists regarding the deliberate indifference of Defendants **Corey Whitaker, J. Gilbert, Bradford Young, Desiree Hammond, and Bruce Markus**.  Defendants shall file their collective Reply **seven (7) days** thereafter.

This 2nd day of August, 2016.



Signed By:

*David L. Bunning*   DB

United States District Judge

K:\DATA\Opinions\Covington\2014\14-51 MSJ MOO.wpd